UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

|  |  |  |
|---|---|---|
| THE LIBERTARIAN PARTY OF KENTUCKY, et al., | ) ) ) | Civil No. 3:15-cv-00086-GFVT |
| Plaintiffs, | ) ) | |
| V. | ) ) | **OPINION** **&** **ORDER** |
| ALISON LUNDERGAN GRIMES, et al., | ) ) | |
| Defendants. | ) ) | |

*** *** *** ***

The Libertarian Party and the Constitution Party are active political associations in the Commonwealth of Kentucky and throughout the United States.  Considered "political groups" under Kentucky's three-tiered election law scheme, the two associations do not presently enjoy the same ballot access rights and privileges as the more dominant Republican and Democratic Parties.  As explained below, there is a mechanism for third parties in Kentucky to gain general access to the ballot.  Significantly, this method is not so exclusive that the Constitution demands the choice of the Kentucky legislature be voided.  Accordingly, the Court DENIES the Plaintiffs' motion for summary judgment but GRANTS summary judgment in favor of the Defendants.

**I**

Political parties have been a part of the American governmental process almost since this country's conception.  Though our first President vehemently warned against the dangers of developing a party system,[1] James Madison's supposition that "the causes of faction cannot be

---

[1] *See, e.g.*, Washington's Farewell Address to the People of the United States (Sept. 19, 1796), *available at* http://gwpapers.virginia.edu/documents/washingtons-farewell-address/.

removed; and that relief is only to be sought in the means of controlling its effects" has proven true. *See* THE FEDERALIST NO. 10 (James Madison). The nation's first party, the Federalist Party, emerged around 1787, with the ideologically opposed Democratic-Republican Party soon to follow. From those early days until the present time, the United States has operated primarily as a two-party system, with the Democratic Party and the Republican Party currently dominant.

Nevertheless, a variety of minor, or "third," parties have played an important role in the nation's history and have contributed greatly to its richness. These include historic and present associations such as the Free Soil Party, the Know-Nothing Party, the Progressive Party, the Reform Party, the Green Party, and the two Plaintiffs. *See, e.g.*, THE ENCYCLOPEDIA OF THIRD PARTIES IN AMERICA (Immanuel Ness & James Ciment, eds., 2000). In fact, one of the nation's current major parties has its roots as a third party. The Republican Party successfully displaced one of the existing major parties around the turn of the nineteenth century, and it has been one of the country's leading political groups ever since. *See* GRAND NEW PARTY, https://www.gop.com/history/ (last visited May 24, 2016); *see also Nader v. Keith*, 385 F.3d 729, 732 (7th Cir. 2004) (discussing roles of third parties in United States history).

Regardless of the size or the political dominance of such a group, the right to associate for the advancement of political ideas has been a crucial part of the nation's framework since the passage of the Bill of Rights. U.S. CONST. amend. I ("Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble.")*; Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *Tashijian v. Republican Party of Conn.*, 479 U.S. 208, 224 (1986) (noting a party's "determination . . . of the structure which best allows it to pursue its political goals, is protected by the Constitution."). The First Amendment, made applicable to the states through the Fourteenth Amendment, protects both the right to associate

and the right to vote effectively as two of the nation's most sacred freedoms. *Williams*, 393 U.S. at 30. As the Supreme Court has explained, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

The Constitution delegates the responsibility of carrying out elections to the states, subject to congressional oversight. *See* U.S. CONST. art. I, § 4, cl. 1. As a result, state legislatures are the primary source of laws regulating local, state, and national elections, and each state has largely developed its own ballot access structure. *See* Dmitri Evseev, *A Second Look at Third Parties: Correcting the Supreme Court's Understanding of Elections*, 85 B.U. L. REV. 1277, 1282 (Dec. 2005). While the Constitution undoubtedly protects the rights of citizens to associate in political parties, the Supreme Court has determined that states may enact reasonable regulations to help carry out elections and reduce related fraud. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *Storer v. Brown*, 415 U.S. 724, 730 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some order, rather than chaos, is to accompany the democratic processes."). It logically follows, therefore, that the judicial branch has at times been called upon to consider the election laws of state legislatures and to ensure those laws do not infringe upon important constitutional freedoms.

The present lawsuit involves such a challenge. Both the Libertarian Party and the Constitution Party believe the Commonwealth of Kentucky's ballot access scheme abridges their First and Fourteenth Amendment rights. The two minor parties are allowed to participate in the political process in the Commonwealth pursuant to certain criteria outlined below, and they argue those criteria unduly interfere with their right to freely associate and to the equal protection

3

of the law.  The Plaintiffs have launched both an as-applied and facial challenge to the Commonwealth's two percent requirement, arguing the law is unconstitutional "as applied to multiple candidates and petitions, and the ability, or lack thereof, of a 'Political Group' to elevate themselves to a 'Political Organization.'" [R. 37 at 1-2, 14; *see also* R. 1 at 13-14.]  The question before the Court is simple: does the Kentucky General Assembly's chosen ballot access scheme comport with the guarantees of the Constitution?  The short answer is "yes;" a more complete explanation as to why this is so follows.

**II**

**A**

The Plaintiffs in this case—the Libertarian Party of Kentucky, the Constitution Party of Kentucky, and individual members of both parties—are currently allowed to participate in the political process according to the following framework.  Pursuant to Kentucky state law, every political association is classified as either a political party, a political organization, or a political group.  A political party is an organization whose candidate received at least twenty percent of the total vote cast in the last preceding presidential election.  KRS § 118.015(1).  Based on the 2012 presidential election, the Republican Party and the Democratic Party are considered political parties under Kentucky law.  [*See* R. 31-1 at 4.]

The second classification, a political organization, applies to an association whose candidate received at least two percent or more of the vote in the last preceding presidential election.  KRS § 118.015(8).  For example, Ross Perot of the Reform Party received more than two percent of the vote in the 1996 presidential election; therefore, the Reform Party was classified as a political organization for the following four-year term.  [*See* R. 1 at 9.]

4

An association that fails to qualify as a political party or a political organization is considered a political group under Kentucky law. KRS § 118.015(9). The Libertarian Party of Kentucky and the Constitution Party of Kentucky, having failed to obtain at least two, or twenty, percent of the vote in the 2012 presidential election, are currently classified as political groups.

All three classifications of political associations are afforded ballot access in Kentucky, though they qualify for the ballot in different ways. Political parties and political organizations earn general ballot access for the four-year period following a qualifying presidential election. KRS § 118.305(1)(a)-(d). Thus, a candidate of a political party or a political organization obtains ballot access by virtue of being his or her association's nominee. By contrast, political groups earn ballot access through petitioning. A candidate running on behalf of a political group—or an independent candidate running apart from any political association—must submit a petition containing a requisite number of signatures before the candidate will be added to a particular ballot. KRS § 118.315(2). The signature requirement varies by office. For example, a candidate running for President of the United States or Governor of the Commonwealth must collect the signatures of five thousand petitioners. *Id.* A candidate running for any congressional office must collect four hundred signatures, and a candidate for the state's General Assembly must collect one hundred signatures. *Id.*

The Plaintiffs concede the petition requirement for a single candidate in a single election cycle is an acceptable rule [*see, e.g.*, R. 37 at 4-5], and, indeed, this is not a case where the Plaintiffs have been denied access to the ballot altogether. Instead, the Plaintiffs' chief concern is with their parties' rights and privileges as a whole. The Plaintiffs are political groups who failed to obtain at least two percent of the vote in the 2012 presidential election but who nonetheless argue that they enjoy a significant modicum of support among Kentucky voters.

They desire the same rights and privileges as political organizations and political parties—namely, they seek the general ballot access afforded to associations obtaining either two or twenty percent of the vote in a presidential race.  As the law stands, the Plaintiffs must petition for ballot access in every race until the next presidential election, when they may once again attempt to obtain the requisite percentage of the vote and thus achieve the rights that come with political organization or political party classification under Kentucky law.

This scheme, the Plaintiffs argue, is unconstitutional.  Through 42 U.S.C. § 1983, they bring this suit against the Defendants for a violation of their First Amendment rights to associate and for a violation of their rights to equal protection of the law under the Fourteenth Amendment.  [*See* R. 1 at 12.]  Because there is no outstanding factual dispute, the Court considers whether the Plaintiffs or the Defendants are entitled to summary judgment on the constitutional challenges as a matter of law.[2]

**B**

Although the Defendants do not challenge the Plaintiffs' standing to bring the present lawsuit, standing is a threshold inquiry in every federal case which may not be waived by the parties.  *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Planned Parenthood Ass'n of Cincinnati, Inc. v. Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987).  "To satisfy the 'case' or 'controversy requirement' of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered 'injury in fact,'

---

[2] The Plaintiffs styled their original motion as a "motion for a temporary restraining order, preliminary injunction, permanent injunction, and summary judgment." [R. 16.]  The matter was then referred to United States Magistrate Judge Edward B. Atkins to craft a unique briefing schedule appropriate for the nature of the case.  [*See* R. 27.]  In response to the Plaintiffs' request for injunctive and summary judgment relief, the Defendants filed a "counter-motion for summary judgment." [*See* R. 33.]  Following oral argument on the issues, the Court now considers the Plaintiffs' original motion and the Defendants' counter-motion as Rule 56 motions for summary judgment.

that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citations omitted). Further, "a plaintiff must also establish, as a prudential matter, that he or she is the proper proponent of the rights on which the action is based." *Haskell v. Washington Twp.*, 864 F.2d 1266, 1275 (6th Cir. 1988) (citations omitted).

Here, the Plaintiffs have suffered an injury in fact due to their lack of general ballot access. This initial standing consideration requires the Plaintiffs' injury be both particularized and concrete. *Spokeo v. Robins*, ___ U.S. ___, 136 S. Ct. 1540 (2016) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-181 (2000)). Both requirements characterize the Plaintiffs' situation. "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* (internal quotation marks omitted). The Libertarian Party of Kentucky and the Constitution Party of Kentucky are, as minor parties, personally affected by Kentucky's current election laws in that they must petition to obtain ballot access for each election rather than run a slate of their parties' candidates pursuant to a blanket ballot access scheme. Further, a "concrete" injury is a *de facto* injury that actually exists. *Id.* The Plaintiffs have suffered a concrete injury as a result of Kentucky's law because they have actually, and not just theoretically, been denied the general ballot access that political organizations and political parties enjoy. *Id.*; *see also Green Party of Tennessee v. Hargett*, 767 F.3d 533, 544 (6th Cir. 2014) (finding, where plaintiffs challenged Tennessee's ballot access laws, the laws "restricted the plaintiffs' political activities within the state and have limited their ability to associate as political organizations." Thus, the plaintiffs properly articulated harm for standing purposes.).

The remaining Article III and prudential standing requirements are also satisfied in this

case.  The Plaintiffs' injury in fact is fairly traceable to the Defendants, who are tasked with administering the Commonwealth's election laws.  *See Bennett*, 520 U.S. at 162; [*see also* R. 26 at 5-9 (discussing why Secretary Grimes and the Kentucky State Board of Elections are proper defendants in this case).]  The injury is redressable, should the Court find Kentucky's ballot access scheme unconstitutional.  *Bennett*, 520 U.S. at 162.  And finally, the Plaintiffs are the appropriate litigants.  *Haskell*, 864 F.2d at 1275.  They are directly affected by the Commonwealth's three-tier political association framework, and, as members of the third tier, they have suffered "an injury peculiar to them and not common to all members of the public." *Hargett*, 767 F.3d at 544 (internal quotations omitted).  The Court, therefore, is satisfied that the Plaintiffs have standing to bring the instant action, and the Court has jurisdiction to reach the merits of the case.

## C

The instant action is not the first of its kind.  As previously noted, federal courts have often been called upon to review the constitutionality of state electoral schemes, particularly with regard to whether the rights of third parties are being abridged.  One of the earliest Supreme Court decisions in this field, *Williams v. Rhodes*, represents significant judicial support for third parties.  *See Williams*, 393 U.S. 23.  In that case, two third parties challenged a series of Ohio election laws, such as the petition signature requirement for new parties, an early filing deadline for the petitions, and a mandated primary election which had to conform to detailed standards. Finding the laws essentially foreclosed new, or old but small, parties from the ballot, the Supreme Court struck down Ohio's ballot access scheme in its entirety as a violation of the Equal Protection Clause.  In reaching its decision, the Supreme Court emphasized the right of individuals to associate for political advancement and the right of voters to cast their votes

effectively as two of the nation's "most precious freedoms." *Id.* at 30.  Specifically with regard to the value of third parties and the appropriateness of protecting their creation and growth, the Supreme Court stated:

> The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes.  So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot. . . .
>
> There is, of course, no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them.  Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms.  New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past.

*Id.* at 31-32.

The Plaintiffs ostensibly look to *Williams* as support for their arguments against Kentucky's current ballot access scheme, under which general ballot access for third parties has been repeatedly difficult to achieve.  But while the *Williams* decision does serve as binding precedent over the present controversy, the case represents "the high-water mark of protection afforded third-party challengers."  *See* Evseev, 85 B.U. L. REV. at 1288.  In subsequent case law, courts have more frequently upheld state ballot access restrictions, focusing on the rights of states to regulate elections rather than the protection of third party development.  Shifting away from a seeming recognition of the inherent value of third parties, the Supreme Court has commented that "[b]allots serve primarily to elect candidates, not as forums for political expression."  *Timmons*, 520 U.S. at 363.  Similarly, the Supreme Court has explained that while a state's interest in political stability does not allow it to "completely insulate the two-party system," a state may nonetheless "enact reasonable election regulations that may, in practice, favor the traditional two-party system."  *Id*. at 367.

9

On the whole, this Court's thorough review of the relevant Supreme Court and Circuit precedent reveals the following trend: where a state's electoral scheme entirely forecloses third party voices, it will not survive a constitutional challenge. However, restrictions—even serious ones—on third parties' ballot access opportunities are generally upheld unless they truly operate to "freeze the political status quo." *Jenness v. Fortson*, 403 U.S. 431, 438 (1970); *see also* Evseev, 85 B.U. L. REV. at 1287-1302.

In recent years, the Sixth Circuit has summarized Supreme Court precedent on ballot access challenges and clarified the appropriate legal test for district courts within the Circuit to apply. The so-called *Anderson-Burdick* analysis, named for the Supreme Court's holdings in *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992), instructs the Court to consider the Plaintiffs' instant challenge according to the following framework, which the Court does with the past fifty years of Supreme Court precedent in mind.

> First, the court must consider the character and magnitude of the plaintiff's alleged injury. Next, it must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. Finally, it must assess the legitimacy and strength of each of those interests, as well as the extent to which those interests make it necessary to burden the plaintiff's rights.

*Hargett*, 767 F.3d at 546 (internal citations and quotation marks omitted).

The first step of the test, which considers the character and magnitude of the Plaintiffs' alleged injury, requires the Court to determine whether the restrictions imposed by the Commonwealth are "severe" or "minimally burdensome." Where state restrictions are severe, "they will fail unless they are narrowly tailored and advance a compelling state interest." *Id.* (citing *Burdick*, 504 U.S. at 434). By contrast, minimally burdensome restrictions trigger rational basis review and "will usually pass constitutional muster if the state can identify important regulatory interests that they further." *Id.* (internal quotation marks omitted). For the

myriad regulations falling somewhere in the middle, the Court should "engage in a flexible analysis, weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it." *Id.* (citing *Anderson*, 460 U.S. at 798; *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012)).

In this case, the restriction placed on the Plaintiffs is the inability of their political associations to achieve general ballot access without obtaining either twenty percent or two percent of the vote in the last preceding presidential election. *See* KRS §§ 118.015(1), (8).  The Plaintiffs argue the Libertarian Party of Kentucky and the Constitution Party of Kentucky both enjoy a significant modicum of support from Kentucky voters.  [R. 16-1 at 4-5.]  Both associations maintain they have been unable to consistently place their candidates on the ballot as a result of the Commonwealth's current scheme.  [*Id.*]  Because their candidates must currently petition separately for each individual race, the two associations consistently struggle to field multiple candidates for office.  [*Id.* at 9-10.]   While the Plaintiffs do not challenge the petition signature requirement as applied to single candidates for office, they do contest the inability of political associations that desire to run multiple candidates for multiple offices to achieve general ballot access "except through performance in the general election," which is limited to the results of the presidential race.  [*See* R. 37 at 1, 3.]

The Commonwealth's current ballot access scheme does not impose a severe burden on the Plaintiffs.  Whether a particular burden is appropriately categorized as severe involves both "legal and factual dimensions," *Hargett,* 767 F.3d at 547, and requires the Court to consider factors such as "the associational rights at issue, including whether alternative means are available to exercise those rights; the effect of the regulations on the voters, the parties and the candidates; evidence of the real impact the restriction has on the process; and the interests of the

state relative to the scope of the election." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 587 (6th Cir. 2006). The challenged restriction here does not completely deprive the Plaintiffs of ballot access; rather, the Plaintiffs have been unable to obtain *general* or *blanket* ballot access as a result of the present law.

While securing places on the ballot through general access may be more convenient or cost-efficient than petitioning for each election, blanket ballot access itself does not appear to be a key associational right. The Commonwealth's scheme does not "restrict the ability of the [Plaintiffs] and its members to endorse, support, or vote for anyone they like," nor does it "exclude[ ] a particular group of citizens, or a political party, from participation in the election process." *Id.* (quoting *Timmons*, 520 U.S. at 361, 363). Plaintiffs are still able to run candidates—either an individual or a slate—for office, albeit through petitioning. And while the petitioning process may require extensive human and financial resources [*see* R. 16-1 at 10-13 (describing the need for professional petitioners and the costs thereof)], courts have already determined that some financial hardship due to repeated petitioning does not constitute a severe burden. *See Green Party of Arkansas v. Martin*, 649 F.3d 675, 683 (8th Cir. 2011).[3] Further, other third parties have been able to achieve general ballot access pursuant to the Commonwealth's current election laws. [*See* R. 1 at 9 (describing the American Party, the Anderson Coalition, and the Reform Party as third parties who received more than two percent of the vote in 1968, 1980, and 1996, respectively).] Both the history of third parties in Kentucky as well as relevant case law suggest that the burden imposed on the Plaintiffs in this case is less

---

[3] As the Eighth Circuit noted in *Martin*, "[a]lthough the Green Party may incur some costs because of its choice to hire individuals to collect signatures, the ballot access scheme does not impose severe burdens on the Green Party and Arkansas need not collapse every barrier to ballot access. *See Am. Party of Texas v. White*, 415 U.S. 767, 794, 94 S. Ct. 1296, 39 L.Ed.2d 744 (1974) (noting that the States need not "finance the efforts of every nascent political group seeking to organize itself"). *Martin*, 649 F.3d at 683.

12

than severe.  Therefore, the challenged law need not survive heightened scrutiny.  *See Hargett*, 767 F.3d at 546.

If the restrictions placed on the Plaintiffs are considered minimal under the *Anderson-Burdick* test, the Defendants' position survives rational basis review.  *See id*.  As justifications for its current ballot access scheme, the Commonwealth points to the need for preventing voter confusion, avoiding ballot overcrowding, and preventing frivolous candidacies.  [*See, e.g.*, R. 33 at 2-3.]  To satisfy rational basis review, Kentucky need only point to "important regulatory interests" that are furthered by the scheme.  *See id*.  In *Timmons v. Twin Cities Area New Party*, the Supreme Court explained that "[s]tates certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials" and noted the states' "strong interest in the stability of their political systems."  520 U.S. at 364, 366.  In light of this and other binding precedent, the interests articulated by the Defendants may best be considered "important regulatory interests" that satisfy the requirements of rational basis review.  *See Hargett*, 767 F.3d at 546.

The restrictions in place here do, however, appear to pose more than simply a "minimal" burden on the Plaintiffs, which triggers the "flexible analysis" outlined in *Hargett*.  *See* 767 F.3d at 546.  This flexible approach notwithstanding, analyzing the Commonwealth's justifications under a higher level of scrutiny does not change the end result.  In *Storer v. Brown*, the Supreme Court considered a California law that required independent candidates to be politically disaffiliated for at least one year prior to the primary election.  415 U.S. at 728-739.  While the exact level of scrutiny employed by the Supreme Court is unclear, the state justifications of requiring a preliminary showing of significant support and avoiding ballot confusion clearly

survived some level of heightened scrutiny.[4]  Similarly, in *American Party v. White*, the Supreme Court upheld the state defendant's interests in "preservation of the integrity of the electoral process and regulating the number of candidates on the ballot to avoid undue voter confusion" as sufficiently "necessary to further compelling state interests."  415 U.S. 767, 780, 782 n. 14 (1974).  In light of cases like these, the Court finds the Defendants' justifications for the Commonwealth's ballot access scheme sufficiently legitimate to survive the Plaintiffs' challenge.  *See Hargett*, 767 F.3d at 546.

Notably, the Commonwealth's restrictions on a political association's ballot access do serve to further the Defendants' articulated goals.  For example, one of the Commonwealth's objectives is to prevent frivolous candidacies resulting in lengthy and confusing ballots.  [R. 33 at 3.]  Under the current Kentucky framework, when a political association is given general ballot access for a four-year term, that association's candidates receive an automatic place on the ballot for local and statewide elections, as well as the next presidential election.  This latter privilege is significant and presumably the justification for requiring third parties to achieve a modicum of support nationally.  Thus, before granting a particular association automatic access to the presidential ballot, the Commonwealth may sensibly require that association to demonstrate the kind of broad-level support on the national scale that may be measured by the ability to obtain two percent of the vote in that particular race.  To specifically justify using the election results of a preceding presidential, rather than gubernatorial, race, the Defendants point

---

[4] While the *Storer* court acknowledged the "compelling state interests" requirement set forth in *Williams v. Rhodes* that would, today, be considered strict scrutiny, *see Storer*, 415 U.S. at 729, the Supreme Court appears to have used what is now known as the flexible approach of the *Anderson-Burdick* test.  *Id.* at 730 (explaining the need to consider "the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification").  Regardless, the state justifications were sufficient to survive the plaintiff's challenge to California's party disaffiliation requirement.  *Id.* at 736-37.

primarily to the fact that the General Assembly has chosen this method to measure an association's popularity and political seriousness.  While it appears that most states measure a political association's modicum of voter support through that association's performance in a gubernatorial, instead of presidential, race [*see* R. 16-6 at 3-4], the Court is aware of no precedent forbidding the use of presidential election results outright, particularly when ballot access for national elections is one of the privileges at stake.

Moreover, this is not a case where the challenged restriction combines with another objectionable law so as to taint the Commonwealth's three-tier framework.  Ballot access schemes deemed deficient by the judiciary typically suffer from a number of infirmities rather than only one such questionable rule or regulation.  In fact, the relevant case law is repeatedly concerned with the effect of a combination of restrictions on a third party's ballot access, rather than one individual condition.  *See, e.g.*, *Storer*, 415 U.S. at 740-45 (remanding case to district court to consider the true feasibility of garnering the required number of signatures in light of the disqualification of primary voters and the twenty-four day time period allowed for petitioning); *Blackwell*, 462 F.3d at 585-591 (invalidating Ohio's ballot access scheme due to the "combined effect" of Ohio's primary requirement with the early filing deadline, among other laws).

Here, the Plaintiffs challenge primarily one restriction—the inability of a political association to convert from political group to political organization status without obtaining two percent of the presidential vote.  Put another way, the Plaintiffs decry their inability to obtain blanket ballot access apart from their performance in the presidential race.  [*See* R. 37 at 1-2.] The sole restriction at play here is insufficient for the Court to deem the Commonwealth's ballot access scheme unconstitutional.  Under the present framework, all an association must do to elevate itself from a political group to a political organization is to obtain a place on the

15

presidential ballot through petitioning, and then to garner two percent of the votes cast by the electorate.  KRS § 118.015(8)-(9).

Political groups that fail to achieve political organization status must undertake repeated petitioning, and the Court recognizes that may not be preferable for those associations. Nevertheless, Kentucky's petition requirement itself does not appear to be particularly burdensome when considered in conjunction with the Commonwealth's other election laws.  For instance, the Plaintiffs make no reference to an early deadline for filing petitions or some other restriction that hinders their abilities to obtain a place on the presidential ballot in the first instance.  *Compare, e.g.*, *Williams*, 393 U.S. at 24-26 (describing the "series of election laws" which have "made it virtually impossible for a new political party" to be placed on the Ohio ballot); *Blackwell*, 462 F.3d at 586-87 (discussing "the burden imposed by statutes requiring political parties to file registration petitions far in advance of the primary and general elections"). And while the Plaintiffs repeatedly emphasize the difficulties that come with petitioning for multiple candidates' ballot access throughout a four-year term, achieving a place on the presidential ballot so as to attempt to achieve blanket ballot access has not itself been a problem. [*See* R. 16-6 at 8-9 (explaining the Constitution Party successfully gathered signatures to place a candidate on the Kentucky ballot in the 2008 presidential race and that the Libertarian Party "has also successfully placed its candidates for President on the ballot in Kentucky each Presidential election year since 1988.").]

In *Jenness v. Fortson*, the Supreme Court noted the apparent stringency of a particular Georgia requirement but still upheld the law in the absence of other questionable restrictions. *See* 403 U.S. at 442 ("The 5% figure is, to be sure, apparently somewhat higher than the percentage of support required to be shown in many States as a condition for ballot position, but

16

this is balanced by the fact that Georgia has imposed no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishes").  The instant lawsuit is like *Jenness* in the sense that only one other state maintains a ballot access scheme tied to presidential election performance, but that rarity is "balanced" by the lack of other arbitrary restrictions which undermine an association's ability to properly function.  *Id.*; *see also* [R. 16-6 at 3-4 (describing Washington as the only other State where an association must qualify for blanket ballot access during a presidential year).]

### III

In the end, the third parties here decry the Commonwealth's ballot access scheme on public policy grounds.  In essence, they seek what is in their view a better law than the one enacted by the Kentucky General Assembly, and they want this Court to impose that law.

Perhaps Kentucky lawmakers could have chosen a more inclusive path to general ballot access.  The benefits of that choice, as articulated by the Plaintiffs, are certainly defensible.  But it is not the job of a federal judge applying the United States Constitution to lecture the Kentucky political branches on how best to do their job.  The important protections embodied in American federalism demand this modest role for the judiciary.  *See, e.g.*, *Burrage v. United States*, ___ U.S. ___, 134 S. Ct. 881, 892 (2014); *Harris v. McRae*, 448 U.S. 297, 326 (1980) ("It is the role of the courts only to ensure that congressional decisions comport with the Constitution. . . . [W]e cannot, in the name of the Constitution, overturn duly enacted statutes simply because they may be unwise, improvident, or out of harmony with a particular school of thought.") (internal quotation marks and citations omitted).  Simply put, if Kentucky's ballot access framework comports with constitutional protections as explained by the teachings of recent case law, this Court's work is done.

17

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** that the Plaintiffs' Motion for Summary Judgment [R. 16] is **DENIED** and the Defendants' Counter-Motion for Summary Judgment [R. 33] is **GRANTED**.  Judgment in favor of the Defendants shall be entered contemporaneously herewith.

This the 8th day of July, 2016.

Gregory F. Van Tatenhove
United States District Judge